*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

IVORY ELIJAH POLK,

        Defendant-Appellant.

UNPUBLISHED
July 17, 2026
1:29 PM

No. 375102
Saginaw Circuit Court
LC No. 22-050295-FC

Before: REDFORD, P.J., and WALLACE and LIEVENSE, JJ.

PER CURIAM.

On November 18, 2022, around 3:00 p.m., two masked individuals bearing firearms exited a Chevrolet Tahoe on South Fayette Street and Fraser Street, in the City of Saginaw, and began shooting at a white/silver SUV, resulting in one victim being shot in the head and another victim being grazed in the abdomen by a bullet. Over the course of a four-day jury trial, the evidence demonstrated that defendant was one of the shooters, including testimony from an expert witness in cell phone geolocation and mapping who connected the cell phones of defendant and another individual, Tony Davis, to the subject intersection around the time of the shootings, as well as surveillance footage from multiple cameras in the area. The jury found defendant guilty of two counts of assault with intent to commit murder (AWIM), MCL 750.83; three counts of carrying a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b; and felon in possession of a firearm (felon-in-possession), MCL 750.224f. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12. Relevant to this appeal, defendant was sentenced to 40 to 60 years for the first count of AWIM.[1]

---

[1] Defendant was also sentenced to the following: five years for each conviction of felony-firearm, second offense; 25 to 50 years for AWIM (second count); and 76 months to 15 years for felon-in-possession. The sentences for the three felony-firearm convictions were to precede and run consecutively to the remaining sentences. The AWIM and felon-in-possession sentences were to run concurrent with each other.

Defendant raises three issues on appeal. First, he argues that the evidence at trial was insufficient to prove that he intended to commit murder. Second, defendant claims that Offense Variable (OV) 6 should have been scored at 10 points and that the trial court erred by scoring it at 25 points. Finally, he argues that his 40 to 60 year sentence for assault with intent to commit murder was disproportionate to him, meaning it was unreasonable. We affirm.

## I. FACTUAL SUMMARY

The trial of this matter took place in the Saginaw County Circuit Court between May 14, 2024, and May 20, 2024. The first witness, Officer Bradley Holp of the Saginaw Police Department, testified that he was walking out of that very courthouse when he heard gunshots, followed by a dispatch call for a shooting. Within four to five minutes, at approximately 3:13 p.m. to 3:15 p.m., he arrived on the scene. He turned off Fraser Street onto South Fayette and saw a white/silver SUV pointing west "up into the front of a home." He saw a man who was later identified as Paris Conway walking towards the open passenger side door of the SUV stating that he had been shot. According to Holp, "it looked like he had a grazed abdominal wound to his stomach." After passing Conway off to another officer that arrived, Holp found Marcellus Cuevas in the driver seat of the SUV, wearing his seatbelt, with a gunshot wound to his forehead and "brain matter and blood matter protruding out his forehead." According to Holp, when he asked Conway who shot him, he said "Tory shot me," and identified the suspect as a "black male and approximately 22 years old." He subsequently received medical attention and was taken to the hospital via an ambulance.

A trauma surgeon from the hospital testified that he tended to Cuevas after the accident, that Cuevas suffered a gunshot wound to the head with traumatic brain injury, and that his injuries were threatening. On cross-examination, the surgeon testified that, "based on what I saw on his CT, the bullet entered one side of his brain and traveled to the other side of the brain, which we consider a transcranial gunshot wound, and those have a mortality approaching a hundred percent."

An eyewitness to the shooting testified that she lived at a house on the corner of South Fayette and Fraser. Shortly after 3:00 p.m., she looked out the window and a Chevrolet Tahoe did a "slow roll" through the stop sign at the intersection. She then saw two men exit the Tahoe and start shooting at a silver color SUV that was behind them.[2] She described the man who exited the driver's side as a black male in his early 20s wearing black, "Carhartt style" clothes that included a hood, and that he was also wearing a black mask. She said he was carrying a mini assault rifle with a long clip. She described the man who exited the passenger side as a younger black male, also wearing a black mask, and wearing the same type of outfit as the other male, but it was a "brownish tan color." The man who exited the passenger side was carrying a weapon that looked like a Glock nine-millimeter. The vehicle at which they were shooting had just turned north onto South Fayette. She heard the shooters yell "take that, that's what you get," and calling them names like "motherfucker and whatever." The witness explained that there were a lot of gunshots and that she lost count of the number. She believed that the person in beige fired so many shots with the nine millimeter that he ran out of bullets, the magazine fell out, and he reached down to pick

---

[2] The witness said the two men exited the rear seats of the Tahoe, one on the driver's side and one on the passenger side.

it up.  According to the witness, when the men started shooting, the driver of the SUV drove into her neighbor's yard across the street, and the car remained there.  After the shooting, the two men ran back to the Tahoe, reentered the rear of the vehicle, and "took off."  The witness said there were four people in the vehicle, including a driver, a front seat passenger, and the two shooters who were seated in the back.  The witness said she then exited her house and saw a man coming from behind her neighbor's house, where she believed he had been hiding.  He showed her a grazing wound, told her that she did not want to see what happened to the driver, and asked her to call the police.

On cross-examination, the eyewitness was asked to admit that she did not know whether any shots had been fired from the silver SUV, but she said she did not see anybody with a gun in that vehicle.  She agreed that she did not know what occurred before she saw the silver SUV turn onto Fayette Street.

On redirect the witness acknowledged that she did not witness a firearm on the person who suffered the grazing wound to the abdomen and did not see a weapon anywhere near the SUV parked in her neighbor's yard.  Additionally, she did not hear any gunshots before seeing the Tahoe and the silver SUV.

The prosecution then called the executive director of Saginaw County 911 as a witness regarding recordings of calls to 911 about the incident.  On cross-examination, he agreed that in one of the recordings (track two), the individual who made the 911 call said, "they were shooting at each other."  He further agreed that another recording (track 4) also said "they were shooting guns."  Finally, he agreed that in a third recording (track five), he heard the caller say "they were in the middle of a shootout."

Conway then took the stand and testified that Cuevas borrowed his mother's vehicle that day in order to take some presents to his girlfriend in Bay City, but she asked that they first go to the store to buy some tobacco products for her.  Cuevas then drove himself and Conway from his residence on Greenwich Street to a gas station, drove back to Cuevas's house to drop off the tobacco products, and then headed to Bay City.  Conway testified that they travelled from Greenwich Street to Vermont Street, turned a corner, and "two men in black jumped out and got to shooting."  They were wearing all black ski masks and Conway could not see their faces.  He said that Cuevas started shaking after he was shot in the head, like he was having a seizure.  Conway leaned the seat back, jumped in the [rear] passenger seat and jumped out the back door.  He fled to someone's backyard and then returned.  He was grazed on the belly.  He testified that he and Cuevas had no weapons.

Cuevas took the stand and identified defendant as the person who shot him.  He said he is now blind in his right eye as a result of the shooting, walks with a cane, and wears a helmet due to the hole in his head.  He said he was not carrying a gun and that he does not even own a gun.  But his version of events was significantly different than those of both Conway and the eyewitness.  Although the eyewitness testified that the shooting started just after 3:00 p.m., which she knew because she had just finished watching a television program that ended at 3:00 p.m., Cuevas said the incident happened at 7:00 p.m.  Further, rather than having been in an SUV with Conway at the time of the shooting (as Conway testified), Cuevas said that he was walking from his house on Greenwich to a neighborhood recreational facility when he was shot on Dearborn Street.  He

testified that Conway was not with him at the time. He admitted to having some issues with memory since being shot but said "I know who shot me though." Yet, at the end of cross-examination, Cuevas said, "No, I don't see him in here," i.e., he did not see the shooter in the courtroom. He also suggested that he was discharged from the hospital the same night as the shooting, despite the fact that it was undisputed that he received inpatient treatment for multiple months following being shot in the head.

Cuevas's mother testified consistent with Conway, stating that she sent Cuevas to the gas station to get tobacco products before the shooting.[3] Her son and Conway left together in her Buick Rendezvous, not later than 2:30 p.m. and returned around 2:50 p.m. When Cuevas came back into the house, he had a conversation with his mother and she perceived that he was anxious, like somebody was after him. She said it was more or less like he was scared that something was going to happen to him. She confirmed that Cuevas wanted to borrow her car to take presents to his girlfriend close to Bay City.

After the shooting, her son was hospitalized through the middle of March 2023—he was initially admitted to the intensive care unit, eventually transferred to another floor, and then spent two to three months at an inpatient rehabilitation facility. Since coming home, she has been her son's caregiver. She testified that her son requires someone to be with him 24 hours-per-day. She testified that "he is not mentally there anymore because of this." On cross-examination, Cuevas's mother agreed that she was in the courtroom that morning when defense counsel and the prosecutor asked her son if he saw the person that shot him inside the courtroom and that his response was "no."

During trial, the jury also heard testimony from Detective Sergeant Specialist Adam Green, from the Michigan State Police (MSP) Audio Video Analysis Unit. He extracted videos from multiple surveillance cameras in the area as well as videos provided by another officer, Detective Graves. Footage showed both a Tahoe and a white or silver color Buick Rendezvous at the subject gas station before the shooting. It also showed the Rendezvous depart the gas station first, with the Tahoe following shortly afterwards. Surveillance footage from Fraser Street also depicted two men exiting a Tahoe and running away from the vehicle. The footage shows those individuals subsequently run back to the Tahoe and reenter that vehicle. Finally, surveillance taken from the Farwell Street address shows the Tahoe returning to that address.

Detective Philip Graves testified that he received a tip that defendant was at an address on State Street. When he went to that address, he found defendant there, performed a consent search, and found two guns, including a nine-millimeter. He also testified that, during a jail call, defendant said there was a cell phone at the State Street address that police had missed finding, and defendant appeared concerned about it. So, Graves obtained a search warrant for the cell phone and retrieved it. He testified that defendant was also affiliated with an address on Essling, so he obtained a search warrant for that address as well. At the Essling address, police found residency documents such as defendant's birth certificate and a hoodie that looked like one worn by a suspect in the above-referenced surveillance videos. The phone Graves retrieved from the State Street address

---

[3] While she testified that Cuevas was not old enough to legally buy tobacco products, she said that he was able to buy such products at the store at the gas station.

had connected to Wi-Fi at an address on Farwell Street after the shooting. So, police conducted a search of that address and found the Tahoe in the garage.

MSP Officer James Horn, a firearms and tool mark examiner, testified that there were approximately 53 shell casings found at the scene of the shooting, as well as 31 bullets and bullet fragments. He said there were two firearms involved in the shooting, one was the nine-millimeter FMG semiautomatic pistol recovered by police and an unknown nine millimeter Luger caliber pistol.

Cassandra Deruiter, a DNA expert from the MSP crime lab, analyzed swabs taken from the pistol grip and trigger of the weapon found by police, and said there were at least five individuals' DNA on those items. Because there were at least five individuals contributing DNA on those swabs, the samples were too complex to make comparisons and determine which individuals may have contributed DNA. She also tested the steering wheel knob and shifter from the Tahoe, determined that it had DNA from four different individuals and compared three known samples she had received, one of whom was defendant. She determined it was 570,000 times more likely that the steering wheel knob and shifter DNA was that of defendant and three unknown individuals than if it was the DNA of four unrelated, unknown individuals. One of the other persons to whom she compared the DNA was Tony Davis—she testified that it was 130 octillion times more likely that the DNA was attributable to Davis and three unknown individuals than it would be attributable to four unrelated unknown individuals. Regarding the DNA on the gear shifter and steering wheel knob, she said "there was strong support for Ivory Polk to be a contributor to that item, and there was very strong support for Tony Davis to also be on that item."

Detective Graves was recalled as a witness on the fourth day of trial. He testified that he determined the cell phone retrieved at the State Street address was used by defendant based on photos and user accounts like social media accounts. He said defendant denied having social media, but Graves found e-mails, Snapchat, Facebook, and an Instagram account on the phone. The Snapchat username was Rambo Polk and defendant acknowledged going by Rambo. Graves also testified that the Tahoe found by police was registered to Tony Davis's mother. He also was aware of a phone number associated with Tony Davis a/k/a Tony Bans, and police obtained a warrant for that phone, which was found in Davis's pocket when he was arrested.

Denise Dutoi-Curtis, a corrections officer embedded with the MSP's computer crimes unit, testified that she extracted location services data from a cell phone associated with Tony Davis.

An MSP criminal intelligence analyst, Elizabeth Wandrei, was then called to the stand. During her testimony, she noted that Defendant's phone was a Wi-Fi phone, meaning he only has service when connected to Wi-Fi, whereas, in contrast, Davis's phone was connected to a cell phone service carrier. She testified that she performed geolocation mapping and analysis with regard to defendant's and Tony Davis's cell phones and Snapchat social media accounts during the relevant time frame on the day of the shooting, determining those cell phones' cell phone tower usage, Wi-Fi connections, and general GPS locations for purposes of determining their relative

physical locations, which included noting that defendant's cell phone connected to Wi-Fi at the Falwell Street address shortly after the shooting.[4]

The prosecution rested and defendant moved the court for a directed verdict, arguing that the prosecution had not submitted sufficient evidence to prove beyond a reasonable doubt the intent to kill in this matter. The court denied the motion.

Defendant then invoked his constitutional right not to testify at the trial and no proofs were offered by defendant.

In her closing argument, the prosecutor asserted that surveillance footage showed a gold, older-style SUV pulling into the Essling Street address at 12:35 p.m., and that defendant's phone had Snapchat locations near the Essling residence shortly after 11:00 a.m. She said, at roughly 2:58 p.m., the Rendezvous carrying the two victims was seen leaving the Greenwich address and, roughly three minutes later, that same gold Tahoe and the Rendezvous pulled into the subject gas station. At roughly 3:01 p.m., according to the prosecutor, there was an exchange between the two in the parking lot as Cuevas entered and defendant exited the store of the gas station. Four minutes later, Conway and Cuevas returned to Greenwich, to pick up the presents and head to Bay City. The prosecutor asserted that, within three minutes, surveillance videos show two individuals carrying firearms shooting behind them and running back to the gold Tahoe, and that a 911 call was made within a minute later, at 3:09 p.m. She said surveillance footage showed the Tahoe return to the Farwell residence at 3:25 p.m. and the testimony of Wandrei showed that defendant connected to Wi-Fi at that address.

Proof of defendant's intent to kill the victims, according to the prosecutor, included the fact that there were 54 to 55 shell casings found at the scene and 30 to 31 fragments and fired bullets, i.e., this was not a situation in which the shooters were trying to scare someone, the evidence demonstrated that were trying to kill the victims. She also pointed to the testimony from Holp, who saw brain matter and blood exiting Cuevas's head and that, based on his training, he did not think the victim would survive. In addition, physician testimony established that the type of wound inflicted, a transcranial gunshot, has a mortality rate that is almost 100 percent.

The prosecutor argued that the evidence proved that defendant was one of the shooters, including surveillance videos, the recording of defendant's interview with police in which he admitted to being at the gas station and admitted to wearing a beige "Carhartt style" jacket, black jeans, and a blue or purple hoodie. She reminded the jury that the eyewitness testified that one of the shooters was wearing a tan brownish "Carhartt-style" coat and that he had a nine millimeter with him. She argued that the gun he was carrying was found at the State Street address underneath a mattress.

---

[4] We note that Wandrei was permitted to give an uninterrupted slideshow presentation, the transcript of which lasts for approximately 17 pages, without employing the typical question and answer procedures of direct examination. However, defendant did not raise any issue on appeal regarding this witness's presentation.

The prosecutor also argued that the jail calls revealed that defendant did not want police to find the cell phone that was later recovered at the State Street address, and which had a photograph of a nine millimeter FMK that mirrored the one found there. She said that testimony proved it was defendant's phone because the phone was associated with his email address and mirrored the number that Wandrei used for geomapping the area. The prosecutor also noted that Horn testified that the FMK expelled some of the casings at the scene of the shooting.

Finally, the prosecutor argued that evidence of defendant lying to police about not having social media accounts and attempting to conceal evidence by telling a woman to hide the phone, as indicated by a jail call, was circumstantial evidence of his guilt.

In defense counsel's closing argument, he argued that the evidence did not prove the shooters intended to kill the victims. He analogized the facts of this case to a shopper who forgets that they left an item on the bottom shelf of a cart, does not pay for the item, and exits the store. That shopper may have left the store without paying for the item, but they did not do so intentionally, argued defense counsel. In other words, counsel essentially argued that even if the shooters fired weapons at the victims, such evidence did not prove an intent to murder them. Counsel argued that Conway admitted to being affiliated with a gang and that he brought a gun to Cuevas's mother's house, which upset her. He reminded the jury that the Tahoe and the Rendezvous were at the Sunoco station at the same time, but that it was the Rendezvous that left first, followed by the Tahoe. Since the Rendezvous ended up behind the Tahoe just before the shooting, counsel argued that Cuevas and Conway returned to gas station, looking for their rivals, which is why the Rendezvous ended up behind the Tahoe at the time of the incident.

Based on the evidence of three 911 calls, defense counsel argued that Conway, who was seen with a gun earlier that day, fired at the Tahoe. Additionally, he said the evidence showed that Conway fled the scene after the shooting, and counsel questioned why he did so, asking whether he "[d]itched a gun," or "[h]id a gun or guns." Counsel reminded the jury that Conway could not identify the shooter and that the only person identifying the shooter was Cuevas, who earlier in the day admitted to both the prosecutor and defense counsel that he did not see the shooter in the courtroom.

The jury began deliberations at the end of the fourth day of trial and resumed the following day. As previously noted, defendant was found guilty of two counts of AWIM, three counts of felony-firearm, second offense, and felon-in-possession. The court determined defendant to be a fourth habitual offender and sentenced him as detailed above, including sentencing him to 40 to 60 years for the first count of assault with intent to commit murder. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence submitted to the jury was insufficient to prove beyond a reasonable doubt that defendant had the intent to murder. We disagree.

When a defendant in a criminal case challenges the sufficiency of the evidence, we consider whether that evidence, when viewed in the light most favorable to the prosecution, "would warrant a reasonable juror in finding that the essential elements of the crime were proved beyond a reasonable doubt." *People v Jackson*, 292 Mich App 583, 587; 808 NW2d 541 (2011).

"Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (quotation marks and citations omitted). "The credibility of witnesses and the weight accorded to evidence are questions for the jury, and any conflict in the evidence must be resolved in the prosecutor's favor." *Jackson*, 292 Mich App 587-588 (quotation marks and citation omitted).

"The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder. *People v Ericksen*, 288 Mich App 192, 195-196; 793 NW2d 120 (2010) (quotation marks and citations omitted).

As previously indicated, defendant preserved this issue at the time of trial by moving the court for a directed verdict following the prosecution's proofs (arguing that the evidence was insufficient to prove the element of intent to kill).

Defendant's assertion, that the prosecution was unable to sufficiently prove the second element is unsupported by existing precedent as applied to the facts of the present case. "This Court has consistently observed that because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient." *Id*. at 196-197 (quotation marks and citations omitted). Over 53 shell casings were found at the scene of the accident, as well as 31 bullets or bullet fragments. The evidence demonstrates that defendant and the second shooter fired those bullets into an SUV occupied by two people. Those facts alone are more than sufficient to prove that defendant's intention, when pulling the trigger of his semiautomatic weapon, was to kill.

Defendant argues that he was justified in pulling the trigger because he acted in self-defense. However, when viewing the evidence in the light most favorable to the prosecution, we are left with unrebutted witness testimony that neither victim ever possessed a gun during the shooting. Although defendant attempts to argue that shots were exchanged between the occupants of the two vehicles before defendant exited the Tahoe, the eyewitness to the shooting said that she did not hear any gunshots before she saw the two vehicles. She likewise testified that she did not observe anyone from the silver SUV produce a weapon and fire at the Tahoe, nor did she see a firearm anywhere near the silver SUV. Police testimony establishes that they did not find any firearms on either victim, in the vehicle they occupied, or in the area searched after the shooting, which included the backyard of the witness's neighbor. The officers who conducted that search were assisted by a canine, and because there was snow on the ground, they were able to track the fresh tracks in the snow, yet they found no weapons. While the eyewitness did testify that she saw Conway, via her home's surveillance camera, give a gun to someone in a vehicle earlier in the day, taking all of this evidence in the light most favorable to the prosecution, defendant has not demonstrated that either victim possessed a gun at the time of the shooting nor has he demonstrated that he acted in self-defense.

As a result, we hold that the evidence demonstrating that defendant used a semiautomatic weapon to fire a significant number of bullets into an occupied SUV, which resulted in two people being shot, one of whom suffered a type of gunshot wound to the head that would almost always result in death, was sufficient to prove beyond a reasonable doubt that defendant possessed the intent to kill.

## III. THE SCORING OF OV 6

Defendant next argues that OV 6 was scored incorrectly at 25 points. For essentially the same reasons expressed in the previous section of this opinion, we disagree.

Under MCL 777.36(1)(b), 25 points is scored if "[t]he offender had unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result."

Defendant did not preserve this issue for appeal. In a criminal case, we review unpreserved claims of error for plain error affecting substantial rights. See *People v Cameron*, 291 Mich App 599, 618; 806 NW2d 371 (2011). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Regarding OV 6, defendant argues that "the evidence didn't show a specific intent to murder." Instead, defendant asserts, the evidence showed only wanton and willful disregard of the recklessness of one's conduct, as opposed to specific intent to murder. But, as we explained above, ample evidence was provided at trial supporting defendant's intent to kill, including the fact that he repeatedly fired a semiautomatic weapon into an occupied car causing an intercranial wound to one of the victims that would result in death close to one hundred percent of the time when such a wound is inflicted.

## IV. PROPORTIONALITY

Defendant's last argument on appeal is that his minimum sentence of 40 years is disproportionate to him. Considering both the offense and the offender in this matter, we disagree.

This Court reviews a trial court's sentencing decision for an abuse of discretion. *People v Skinner*, 502 Mich 89, 131; 917 NW2d 292 (2018). "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). In other words, a sentencing court abuses its discretion if the sentence imposed is disproportionate to the seriousness of the circumstances involving the offense and the offender. *Id*. at 460.

In *People v Parks*, 510 Mich 225; 987 NW2d 161 (2022), the Michigan Supreme Court held that the Michigan Constitution's Cruel or Unusual Punishment Clause, Const 1963, art 1, § 16, requires that any 18-year-old convicted of first-degree murder receive the same individualized statutory sentencing procedure as juveniles convicted of first-degree murder. *Parks*, 510 Mich at 255. Thus, the Court found that sentencing the defendant in *Parks* to mandatory life without the possibility of parole (LWOP) constituted cruel and unusual punishment, vacated Parks's automatic sentence, and remanded to the trial court for resentencing. *Parks*, 510 Mich at 268.

In *People v Taylor*, ___ Mich ___; ___ NW3d ___ (2025) (Docket Nos. 166428 and 166654); slip op at 2, the Court extended the decision in *Parks* to 19- and 20-year-olds. While defendant acknowledges the holding in *Taylor* does not specifically apply to him, he nonetheless argues that the scientific conclusions discussed by the Court in that decision should apply to him as well.

We find that *Taylor* is inapplicable to defendant for multiple reasons. First, unlike the defendants in *Taylor*, defendant was not sentenced to LWOP in this case. He was sentenced to a minimum sentence of 40 years. Second, as defendant concedes, he was not 19 or 20 years old at the time that he shot the victims in this case, he was 21. Third, unlike the defendants in *Taylor*, defendant in the present case was sentenced as a fourth-offense habitual offender.

Defendant argues that the Michigan Supreme Court has been following a national trend to sentence 20-year-olds convicted of first-degree murder to a maximum of 40 years, but likely less. Further, he argues, "Assault with Intent to Murder is two steps down from 1st degree murder in culpability," and that defendant's 40-year sentence for AWIM is unreasonable because it is a de-facto life in prison without parole sentence for a 21-year-old.

Again, defendant fails to address the fact that he was sentenced as a fourth-offense habitual offender. He likewise cites to no published authority applying *Taylor* to a defendant who was 21 years old at the time of the crime. As to his argument that his sentence constitutes a de-facto life sentence, we note that he will be 66 years old when he is eligible for parole.

When considering whether the 40-year minimum sentence imposed by the trial court is proportionate to the seriousness of the circumstances surrounding the offense and the offender, under *Steanhouse*, 500 Mich at 459-460, we note that defendant was convicted of attempting to kill not one, but two people, at the time of the shooting. One victim, Cuevas, suffered a bullet wound to the brain that, after undergoing surgery and at least four months of inpatient hospitalization and rehabilitation at a facility that treats patients suffering from brain injuries, caused him to become permanently blind in one eye. He likewise now wears a protective helmet, due to the hole in his skull caused by a bullet. According to Cuevas's mother's trial testimony, she has been his caregiver since he was released from the rehabilitation facility, he cannot make decisions for himself, and he cannot live by himself. When Cuevas left her house that day, that was the last time she saw her son "the way he was." Although the record before us does not appear to indicate precisely how old Cuevas was at the time of the shooting, his mother testified that he was not yet old enough to legally purchase tobacco products, meaning he was under the age of 21 at the time of the incident. With regard to defendant, the offender, while we note that he was only 21 years old, we also note that he was previously convicted of: carrying a concealed weapon in 2017; violation of probation and carrying a concealed weapon in 2019; improper use of a firearm from a motor vehicle in 2019; and additional convictions in 2021 that included felony-firearm, carrying a concealed weapon, and assaulting, resisting or obstructing a police officer.

Thus, when considering whether the 40-year minimum sentence imposed by the trial court is proportionate to the seriousness of the circumstances surrounding the offense and the offender in this matter, we find that defendant's sentence of 40 to 60 years for AWIM is proportionate. As a result, we find that the trial court did not abuse its discretion when imposing that sentence in this matter.

Affirmed.

/s/ James Robert Redford
/s/ Randy J. Wallace
/s/ Andrew J. Lievense